Good morning, Your Honors. Thank you for your patience. My name is Rachel Fazio and I'm representing the appellants. In this case, Earth Island Institute and Center for Biological Diversity. If you could just keep your voice up, that would be helpful. Okay. I'd like to reserve four minutes for rebuttal time. We're here in this case on denial of preliminary injunction. And we're here because there were serious errors and by the district court in this case. And we need relief from the Ninth Circuit in order to remedy those. I have way more than 20 minutes worth of stuff to say, so I'm going to try and cover as much as I can and just want to start right off addressing the main issues I think need some clarification. One of the main claims that plaintiffs have is a claim that the mortality guidelines utilized to predict whether or not trees will die from their fire-related injuries are inaccurate. That particularly with regard to the white fir trees that are larger than 20 inches in diameter and the ponderosa pine trees, that the data that indicates when a tree is likely to die is not reflected in the guidelines that were created. Can I cut to the chase? I think I'm cutting to the chase on this one. We have a declaration in the executive record from Ms. Smith who clarifies, if that's the right word, Table 3-6. I was unable to locate a full copy in the materials in front of me of the so-called Hood Study. The clarification that she offers is to say if you use these criteria that will produce, that will get 90% of the trees and so on, is that clarification anywhere in the Hood Study? Yes it is, Your Honor. This exhibit is from the Hood Study and it depicts a chart which indicates for white fir that's 20 inches in diameter what the probability of mortality is for these trees. Now according to this chart, which is based on the entire data set utilized in the Hood et al. study, if you have a white fir that's 20 inches in diameter or greater and it has 65% crown kill, the probability of mortality is 38%. Now the guidelines that were created for this project indicate that the probability of tree mortality for a white fir that's larger than 20 inches in diameter is actually, is 87%. We're dealing in terms of tree mortality in this context with helicopter and skyline logging guidelines only. So you have the study which says if you have a tree that has 65% crown scorch, it only has a 38% chance of dying from its fire-related injuries, and then you go to the probability of tree mortality for these guidelines and they say, oh no, it has an 87% chance of dying from its injuries. So the study, the data that actually informs says 38% and the guidelines are presenting to the public that actually it's only, it's 87% chance this tree will die. I may be missing something, but as I understood the Smith Declaration, she's saying the material on this table tells us how confident we are in our prediction of mortality. It's not itself a prediction of mortality. The prediction of mortality, she says, is different. And the prediction of mortality is 90% under certain circumstances, and my confidence in that prediction is say 96%. That's what she says in her declaration. And what I'm asking you is, is what she says in her declaration in the Hood Study? No, it's not in the Hood Study. This is, her declaration came... It's not that type of... No, it's not in the Hood Study. And the problem, and this is the thing that the district court misapprehended in Plaintiff's claim, is that the representation made to the public in the environmental impact statement is that there are going to be very, very few trees that meet these guidelines that would otherwise survive. So we're talking about a de minimis number of trees that would otherwise survive that would be cut. We'll call those live trees because they would survive their injuries. So they said, we don't have to look at the impacts of removing live trees from this timber sale area because we've come up with these great guidelines and almost all the trees are going to die. So there's just a very small fraction of them that would otherwise live. But that is not true, and that is not representative of the actual data that has been gathered on when trees succumb to their fire-related injuries. And the EIS is rife with statements that basically say that, oh, don't worry about it. There's not going to be a lot of mortality from these guidelines. All these trees we're picking, they're going to die. There's just... A few might survive. But in reality, almost two-thirds of the ones at 65% crown scorch would survive. What's your evidence for that? That is the Hood, et al. study. This table here that I'm showing you is figure 5. This represents the data that was collected in the Hood, et al. study with relation to large white firs, and it plots out on the chart according to particular models when the trees succumbed to their fire-related injuries. And if you track the bottom, it says percentage crown length kill. So the percentage that we're dealing with here is 65% because that's the mortality guideline for large white fir on helicopter and skyline logging units, which are the majority of the units in both timber sales. Now where do you get 65% off this table? I'm looking at ER-9. Where do you get 65%? Percentage crown kill is the bottom. Yeah. 0, 10, 20, 30, 40, 50, 50. Yes, yes. And then the model they use for the power fire sale is the bottom. And then the model they use for the power fire sale is the bottom line. So you go straight up to the bottom line, then you come over here to the predicted probability mortality, and it's 0.38, is our best estimate. Thirty-eight percent chance that a large white fir with 65% crown scores will die from fire-related injuries. Now, there's dispute over whether this table means. And the defendants and the interveners have all tried to say, oh, no, no, no, it doesn't mean that probability of tree mortality. The title of the table is probability of tree mortality. The subset here says table 3-6. Yeah, but the sense, if I understand this correctly, the Smith Declaration says this is not actually tree mortality. This is the confidence we have in our prediction of tree mortality. But it has no relation to the EIS. But no, I'm trying to understand. Is that your understanding of the Smith Declaration that we've been given? Yeah, the Smith Declaration is trying to say that this table doesn't say what it says it says. It's entitled probability of tree mortality. Even in this language here, it says indicates the probability of tree mortality to individual trees meeting the power fire marking guidelines. I don't know what else the public is supposed to assume. But even if you accept her declaration, which was written during litigation, which has no citations to the EIS, which discusses methodology that was never discussed in the EIS or in the guidelines for mortality, even if you accept that, there's still a problem. And that problem is that because of the way they structured these guidelines, they did not assess the impacts of removing live trees from this fire area. Okay. Now, I hate to do this because we're under such time pressure. Could you talk about the spotted owl? Yeah, I was just going there. That segues from this discussion. Because of the choice of guideline for tree mortality and what trees they can remove, and maybe they have the ability to choose whatever one they want, like the district court said, methodology, except I would argue that their methodology must actually be based on the data and accurately reflect the data, which this does not. But the result of this guideline is that tens of thousands of trees that would otherwise survive their fire-related injuries will be cut down. And there is no impact analysis of what that will do to the California spotted owl. And as we know, they return to the area. There are owls in residence. And they will be logging in the historic packs. They will be logging dead trees in the newly created packs. And they will be logging the home range core areas, all to the tune of 65% crown scorch. White fir and ponderosa pine are the two most numerous species of trees in this project area. And helicopter and skyline logging is the most prevalent type of logging in these project areas. There will be tens of thousands of live trees that would otherwise support spotted owls now and into the future, and also support the regeneration of the project areas. And there is nothing in here that deals with that issue. Nothing in either EIS that speaks to the harm, the possible irreparable harm that could occur. And just to give you an idea of the intensity of the logging, this map depicts spotted owl protected activity centers before the fire, and the spotted owl protected activity centers that they redrew after the fire. So the really dark areas are the old packs, and the striped areas are the new packs. Okay? And how do I tell what's an overlap between an old and a new? That is to say, I assume that the new are not entirely replacing, but to some degree they're overlapping. Is that right? There may be some amount of the old pack that's been incorporated into the new pack, but these show the new boundaries. So what's in black, I believe, is no longer a pack, and what's in striped is the new delineated pack. Okay. This map shows basically the intensity of logging. The red outline that you see on the map is the redrawn pack AM 017. And the only areas within that newly drawn pack where logging will not occur are the hatch marked areas. This little area here, this little area here, and this little area here. The rest of it is scheduled to be skyline logged. Now within the pack, they're only allowed to remove dead trees, but dead trees have a value to spotted owls just as much as live trees do. They support the owl's ability to nest and roost, and in burned areas they often create a better prey base for the owls. So it's still very important habitat, but there is going to be logging in over two-thirds of that pack. And there's no discussion on how this might affect the owls, never mind the fact that they didn't even do surveys until they were mostly through the process. Plaintiffs didn't get any owl survey data until after the final EIS was sent out for comment. These two projects were rushed through the process in order to maximize economic gain and to ensure that timber sales got bought. And in the process, they did analysis over the winter, they didn't do on-the-ground ground-truthing once summer months came to check on ground cover. They issued the draft before they even started owl surveys. There are so many problems with these sales that it's mind-boggling. But there is definitely a possibility of irreparable harm that the spotted owls would suffer, and the district court erred in finding that we didn't meet our burden with regard to that. When you think of the public interest, would you comment on the East Bay muds concern that the water would be affected, it breaches those of us who live in the East Bay? My comment to that, aside from the fact that it was not before the district court. It was not what? It was not before the district court. Oh, not at all. No. So it shouldn't have been cited. No, I don't believe it should have been cited. Well, that's enough. I think that's enough. Okay. But just two words aside from that. The East Bay mud is going off of the representations of the Forest Service, that there will be drainage issues and that there will be erosion potential, et cetera, et cetera, if they don't do all this logging. We had Dr. John Rhodes go out to the site after the growing season, after the winter, after there was plenty of ground cover on the ground. Last winter was as heavy as this winter is turning out to be. So if there was going to be any type of erosion potential, there would have been evidence of it at the time he visited the site in August. And there wasn't. There was no evidence of accelerated erosion, no evidence of ground cover that was not in place to prevent such erosion. So I don't think the record, the factual record on on-the-ground conditions at the time of logging support East Bay mud's concerns that there would be a problem. Speaking of these on-the-site visits, do you agree that the case has moved with respect to one of these projects? No, I don't. I do not agree that it's moved. Logging has been completed, right? You know, the logging contracts are in place for two years, and they have the opportunity to go back in there and pluck trees from areas that they didn't get trees from in the first place. And aside from that, the issues between these two sales are so similar, it would serve no judicial purpose to moot one and rule on the other, which still has current ongoing logging as well as the potential for future logging. They've said in the EISs that they're going to monitor for, you know, up to four years for delayed mortality. These sales aren't over. In the Fred's fire, where either all or most of the logging has been done, have they finished the helicopter logging? Because as I read the FEIS, they're not going to go back as to helicopter logging. Yeah, you would have to ask the interveners. But you're talking about they can go back, at least according to the FEIS, for the skyline and tractor logging. Right, and for the areas that are currently low severity that would potentially experience some delayed mortality and would meet their 25% criteria. Now I only have two minutes, and I'm going to do some math, so bear with me. The other issue that I really wanted to clarify for the court is this issue of how much suitable habitat would remain in these areas for the woodpecker species that need burn forests to survive. The plaintiffs claim that there will be a de minimis amount. With regard to the Fred's fire, you know, three to six percent is what's left in the entire fire area. And with regard to the power fire, that they would be removing almost 80% of the suitable habitat. Now the court found different figures and never cited where he came up with his figures. And his assertion is that, and I'll just use Fred's fire for now because it seems to be the easiest to understand, but his assertion was that in the project area, the area that they're going to log, 36% would be left for these species. And in the fire area, 62% would be left for these species. But in order to accurately calculate how much would remain for these forests, what's the suitable habitat? And how many acres of that suitable habitat are there before you log? And then what's left after you log? And if you look at the numbers in the Fred's record of decision, they indicate that there's 7,700 acres that burned in the entire fire area. 4,600 burned on the El Dorado National Forest. And of those 4,600, only around 3,000 burned at high or moderate severity, which is the necessary severity that it needs to burn out in order to produce suitable habitat. So the defendants are planning to log 2,936 acres within the fire area. There's only 3,025 available for these species. And they're only leaving 165 acres. There's only about 4% retention of suitable habitat within the Fred's project area. The court seems to believe that there's 34, and I have no idea where he got his numbers because they conflict with the numbers in the record. Okay. At this point, why don't we hear from the other side and we'll give you some chance to respond. Okay. There are a fair number of papers, so take your time sorting them out. May it please the court. My name is Ron Spurtzer. I'm here on behalf of the Forest Service and the other appellees. Let me begin. First of all, before I forget, I misspoke earlier. We have not seen this earlier, as I mentioned. We do not believe this is actually a document. It appears to have additions to it. It's something we haven't seen before. It puts us in a very difficult position to have to comment on it. Well, I think that it is in the excerpts of record with the red and the blue markings. All right. Well, I'm told by co-counsel that it was. When we're clarifying things, is that East Bay mud thing in the Yes, Your Honor. What they're mixing up two things. There were East Bay mud comments on the FEIS. We quote from those in our brief. They're in our excerpts of record. Those were before the district court. They make that point that Your Honor was referring to. Now, what happened is when they moved for an injunction pending appeal in this court, we submitted a declaration from East Bay mud that essentially went over the same issues. That declaration, it's true, was not before the district court. But the comments in the EIS that we quote from in our brief most definitely were before the district court. And they clearly support the public interest in proceeding with this project for the reasons that East Bay mud articulated. The reasons given in the comments are substantially the same as the reasons that were later put in the affidavit. We simply wanted to make clear in response to the injunction pending appeal motion that those continue to be concerns of East Bay mud. As long as we are getting into the public interest, and I'm sorry in a way to interrupt your presentation, but you know I express quite a lot of concern about the financial interest of the Forest Service. And then I see this emergency motion that says we're going to lose $12 million and we won't be able to do the things we'd like to do. Doesn't that suggest a biased decision maker? No, Your Honor, not at all. These are things that the Forest Service is doing in pursuit of its congressional mandates. I know it. Now, wait a minute. We said, or I said anyway, that congressional mandate doesn't authorize a biased decision maker. It's not a biased decision to attempt to prevent devastating wildfires. No, it is not. Of course not. But if they're getting money out of it, it is. That's the point. How do you meet that point? Well, let me make several points in response to that. First of all, this claim, which they made in their brief on appeal, was made in their brief on appeal for the first time. It was not raised in the district court. Your Honor's concurring opinion. Raised in the opinion coming from this court. I assume that was brought to the attention of Judge Englund. The opinion probably was cited, but there was no claim made because, Your Honor. Oh, but, I mean, he reads, doesn't he? I'm sure he does, Your Honor. Yes, and you read it. You represented the Forest Service below? No, Your Honor. Oh. But, I mean, certainly it's true Your Honor's concurring opinion would have been known to the district court, but they did not – but there have been decisions from this Court since then that continue to apply the arbitrary and capricious standard of rebuke to Forest Service decisions. That's true. And we can change that, you know. I understand that, Your Honor. But there are a number of reasons why you shouldn't. First, it wasn't actually – while he would be aware, of course, of decisions of this Court, they did not argue, and they would certainly have the burden to argue, below, that he ought to apply a different standard of review than is applicable under Ninth Circuit precedent. I don't see how he could have done that, consistent with this Court's rulings, to say, I'm going to apply a more greater burden. Well, would you – instead of relying on the way it's always been, would you just address the problem? That is, how do you see this decision-maker as unbiased if they need a large amount of money to keep on with their ordinary activities? That's the system that Congress has created, Your Honor. I don't think that the agency – Congress has done lots of things. You've read the papers recently. And Congress has done something much similar with EPA, for example, with the Superfund program. They get money back from bringing enforcement actions. They put it in the Superfund. They spend it on additional programs. To hold that that kind of activity, with all due respect to Your Honor's earlier concurring opinion, I simply – I suggested it's – it relied on the idea that what the Forest Service is doing is an adjudication. And that is simply not correct. They are not adjudicating rights of specific individuals. They are making a policy, legislative-type decision. There are numerous cases in the Court of Appeals that hold that claims of the fact that an agency will – or the government as a whole or the agency will get funding, for example, the IRS when it issues regulations, the Department of Interior when it issues oil and gas leases and so forth. But the mere fact that money goes back to the government does not – As the concurring opinion indicated, it all depends how vital the funding source is. But let me ask you this, because this has raised my Earth Island in its grief. They didn't say that your Forest Service is disqualified. They said it's not entitled to the same deference. But that's wrong, Your Honor. If it's a biased decision-maker, the case law that Your Honor cited in the concurring opinion says you're disqualified, that means essentially the Forest Service is disqualified from administering the statute Congress delegated it the authority to administer. It might mean EPA is disqualified from administering the Superfund statute if their program works. Excuse me? We take these things one at a time. Consider this middle position. They're not disqualified, but they're not really entitled to the same respect that an unbiased adjudicator is. I don't think – I simply don't think that's consistent with the case law. And, in fact, Your Honor also seems to be relying on a notion of due process that, with all due respect, I submit is wrong. And that is that these kind of general legislative decisions are equivalent to adjudications, and they are not. They are not equivalent for due process purposes. And the due process concern is the thing that underlies these cases that deal with the right to an unbiased adjudicator. I don't mean to interrupt Your Honor's questions. This is an interesting issue. I'd love to explore it. But I think in due deference to my client, I need to at least respond to the treatment mortality guidelines claims that it made because they are completely inaccurate. I think the basic point the Court needs to understand is what happened below. This is not a case where somebody commented during the administrative process about an alleged discrepancy between the information in the EIS and the Hood Study. The EIS made clear that the methodology used in the Hood Study was relied upon. It made clear that there were various models developed based on or in. Maybe I can cut to the chase with you as well. I'm looking at paragraph 5 of Ms. Smith's declaration. Okay. If you want to check your record, it's ER tab 26. It's on page 2. Okay. And you're asking me about which paragraph again, Your Honor? It's paragraph 5. It's on page the second half of page 2 of that declaration. All right. Actually, it's the third page, but it's got a number 2 at the bottom of it. Here, this is quite a lucid explanation as to what the Hood Study means.  It is consistent with the Hood Study. These exact words, are they in the Hood Study? No, not to my knowledge. I should say I haven't read it line by line. You have not read the Hood Study? I mean, this is a key paragraph because this is the paragraph upon which she relies to say, well, the prediction of mortality is correct. Without that. It's explaining because of the fact that this was not raised during the administrative process, but was raised in a declaration that they submitted to the district court after the administrative process had been completed, we responded with this declaration that explained why what is in the EIS is consistent with the Hood Study. Let me back up and maybe we can. This declaration is directly in response to Dr. Royce's declaration. That's correct. And she's saying Dr. Royce has simply misunderstood the Hood Study. And if you want to understand the Hood Study, you've got to understand this. Well, my problem is, as I read the FEIS, it has the same understanding of the Hood Study as did Dr. Royce. No. That is to say, I'll just read it to you and you can then tell me why I'm wrong. All right. I'm on, it's your excerpts of record now, so supplemental excerpts of record, tab A. Now, you didn't do internal pagination, so it's pages 70, page 77. Right. I have that. And it says table 36 indicates the probability of tree mortality to individual trees meeting the power of fire marking, blah, blah, blah, and then we reproduce table 36. Right. And as I read that, that is reading table 36 in exactly the same way Dr. Royce read table 36. No. And this Linda Smith, excuse me, the Smith Declaration says, oh, no, you didn't read it properly. What this does is tell us the probability of our confidence in the prediction of mortality. This is not a prediction of mortality. Let me explain, if I can. I have to back before, in order to explain this to you, I have to back up a little and make a basic point. What is in the Hood study, the Smith study, the Hood study, is probabilities of mortality for a tree with a specific level of crown scorch or other variables that she discusses in the study. Let's take the hypothetical example of one with 65 percent crown scorch. She tells you she has models that will indicate, and she attached the specific model that was used to her declaration. That is the relevant model to look at, it appears, or is attached to her declaration, not the tables that were put up here. Yeah, and I'm now on this. And that is explained in the EIS, by the way, that there are various models developed pursuant to the Hood methodology. Make sure while I'm looking at the same thing. This is the attachment to the Smith Declaration. Right. Well, and then the marking guidelines that specifically. It's very clear. Right. Is this in the Hood study? I don't know for sure if this particular. That would be an answer to no. What? If you can speak to him and then he can speak into the microphone, that would probably be easier. What she's saying is these materials that Your Honor was pointing to are derived from the Hood study. The short answer is. They follow the methodology. The short answer is they're not in the study. But the actual graphs themselves are not in the Hood study. But what Your Honor's. But without these graphs, I read the Hood study pretty much the way Dr. Royce read the Hood study. And as it appears to me, the FEIS reads the Hood study. No. Let me explain. This is what Dr. Smith, what Mrs. Smith is explaining and where Dr. Royce got it wrong. As I said before, there are, in the Hood study, they are taking a tree with a specific level of a particular variable, say crown scorch, 65 percent. Just as a hypothetical, I'm saying. Its probability of mortality is such and such. What this says, table 3-6 indicates the probability of tree mortality to individual trees meeting the power of fire marking guidelines. Now, you need to understand what that means. A tree meeting the guidelines would be one with 65 percent or 70 or 75 percent or 85 or 90. That's why these numbers are different. They are different because when you take, and when you take real world trees that meet the marking guidelines, it isn't just, what they're assuming is that every tree has just 65 percent crown scorch. And therefore, the numbers should be the same. That's not the case. And it's reasonably clear from reading this. But this is what she's clarifying in the declaration. The probability of mortality here means taking these guidelines and applying them to real, a real set, a data set of information about trees in the real world. The marking guideline of 65 percent means, of course, 65, 70, 75, whatever, anything that's above 65 percent. And what this information is telling you is the probability that the tree will, in fact, die if we use the particular marking guideline, given that trees will be marked when they have crown scorch greater than 65 percent or greater, or whatever the specific marking guideline has to be. That's what she's explaining here, in my words. But that's basically what she's saying here is. I don't understand your explanation. There are two different things going on, as I now understand it, in light of the later Smith declaration. Number one is the predicted tree mortality if you have a certain amount of scorch and a certain DBH, either above or below the 20 mark. Right. And then the other criterion is, or the other thing that we're told is, that first thing predicts the tree mortality, and the second one tells us the confidence that we can have in the prediction. I think that's also an... It tells us that what's in the FEIS on Table 3-6, those numbers are the confidence we can have in the prediction. That's not the prediction itself. That's what the Smith declaration tells me. I think I'm essentially in agreement with you, Honor, but I'd add this clarification. It's the confidence based on applying the guideline in the real world to a data set. Well, I understand that, too. But what my problem is, as I read the FEIS... Right. There is no way that I can understand that what being told here, what I'm being told is, this is the percentage of confidence that we have in the prediction of mortality. The way this reads is it looks as though it's a prediction of mortality, not prediction of confidence of the prediction of mortality. I think there's a... Your Honor is drawing a distinction there that, well, I'm not... That Ms. Smith makes. It's not mine. Well, no. I think what she's saying, that tells you both. If we apply the marking guideline of whatever it happens to be to a real world data set, and it turns out 96% of the time the tree we think is going to die dies, then we can have a 96% confidence in it. In other words, it represents both. It's not... If what Your Honor is suggesting is that this has nothing to do with actual probability of tree mortality, that in some way the table is misleading, no, that's not true. It's quite a bit to do, but it's the two different layers in the way that she has explained in her declaration. And her declaration is a very clear... It's almost a subtle point, but it's a very clear explanation of it, but I don't see it reflected in the FAIS is my problem. The other response I would give to that, again, Your Honor, is parties have a burden to participate in the administrative process. We're here arguing about something that could have been clarified in the response to comments if they'd commented on this. The Supreme Court made clear in its 2004 public citizen decision it expects people to comment on issues like the... issues underneath the... and certainly equally applicable to the National Forest Management Act. It's unfair... I'd like to get back to the main legal problem for you. You've read the Earth Island 1, as we might call it. You know in that Judge Thomas's opinion points out that Judge England recited the proper legal standards and then failed to apply them. Now, he repeated... Judge England repeated the same mistake here. No, Your Honor. And the way you deal with that in your brief astonished me because you say he didn't slavishly have to use the formula again. But we had already said in Earth Island 1 he has to get it right when he applies it. He gave the correct statement of the law. He gave it just the same way he did in Earth Island 1. Let me draw your attention to what he says on the woodpeckers. The plaintiffs have not demonstrated irreparable harm. And again, he says there is no immediate and irreparable injury. Applying the standard, he gets it wrong. Is there any doubt about that? He gets it wrong. Definitely there's a doubt that he got it correct. He was correct that there is no irreparable harm to the woodpecker. Let me... But he's not getting the right standard. He has to say there's no possible harm. Well, he had said that earlier. No, no. He's applying it. He said the generalization at the beginning. He does not say it when he comes to the case at hand. Even if Your Honor is convinced that he had to say... Well, you look at Earth Island 1 and you'll see he made the same mistake before. The mistake there that the Court singled out was that he said there had to be a concrete probability of harm. He did not... But what's the difference between that and saying there's no immediate and irreparable injury? He is... I think we can give him the benefit of the doubt that he remembers the correct statement. He fails to cite the opinion. He cites it once in something quite irrelevant. He behaves like a judge who doesn't want to be informed by the Court of Appeals. May I move... Isn't no immediate and irreparable injury the same as no concrete injury? No. I don't think that's the same. He's referring back to the... He has in mind the standard that he has earlier given. I don't think there's... Why doesn't he use the word possible? I just don't think it's reasonable to say that he's... Most opinions I've read don't say over and over and over again possibility of irreparable harm. He's already been told in Earth Island 1 he better get it right when he comes to specifics. Can I make one other point in... You're not responding to me, sir. I think I've said all I can say on that, which is I don't interpret that to mean something different from what he stated earlier. What about this one? The plaintiffs have not demonstrated irreparable harm. Right. There's no possible there. I would interpret that to refer back earlier. Why do we have to interpret what was very clear? Let me make a point, if I may, Your Honor, that even if Your Honor is correct or even if that's error, he didn't stop there this time. He went on to say, he went on to balance the equity. He went on to say... Where is the balancing? He went on to say, that's in his opinion, balancing... He has something called balancing. Where does he get the... He gives all the things favoring the Forest Service. Where is anything stated favoring the other side? He says, this is on page 17 of his opinion. Yes. Even if plaintiffs were successful in demonstrating some environmental harms, in balancing the relative hardships, there is no presumption that environmental harm should outweigh other potential harm to the public interest. He goes on then... But where does he state the... For a balance, you have to state what's on the other side. He states all that's on the Forest Service side. No. But he's referring back to the harms alleged by the plaintiffs in this case. An irreparable harm finding. No. He's saying even if there is, even if they were successful in demonstrating some, even if they did it, in other words, even if they met the possibility or risk of harm standard that Your Honor is referring to, I still find against them because the balance of interests and the public interest weigh against granting the injunction. But I think your idea of balance is a very odd one. Well, I'm not sure what Your Honor means. The balance, this Court has said, the Supreme Court has said, you have to factor in the public interest. And that's what he did. You can't just say, obviously he can't just grant an injunction based on a possibility of irreparable harm. He's got to look at the other side. He's got to look at the public interest. The Supreme Court said that repeatedly. But balance means looking at both sides. And he did that. He considered the environmental harm alleged by the plaintiffs. Now, let me make a point in what little time remains on that. When they say the woodpecker species would be impacted, if you look at SERA, Bar Records, at page 247, there's a table. And I can just have a little bit of time, but I'd like to make, this is an important point to understand. Let me interrupt for just a minute. Don't panic. This is a complicated case. Say what you need to say. All right. I'm sorry, Your Honor. I'm sorry. No, no. But I just want to let you relax a little bit. I'm not going to cut you off. Okay. Thank you, Your Honor. I think it's important to understand on page 247 of the, this is the Power EIF, FEIS. Okay, I'm sorry. I'm going to slow you down. I want to read along with you. Where are you? Table 3-75. And where are you? Page? 247, SER, tab A. Tab A, 247. Right. Table 3-75. Okay, I'm with you. Look, there's a species group, Forest Associates. Now, if you look earlier at page, I believe it's 197, you'll see Williamson Sapsucker, one of the woodpecker species they talk about. It's a Forest Associate. Forest Associates means they prefer live trees. They're not species that do better in burned trees. They prefer live trees. Look at the comparison between the acreage before and after. That's the second, next to the last column and the last column. 2966 acres before, 2966 acres of high and moderate capability habitat after. So the idea that they've shown a decline in habitat for, they say that the district court got this all wrong. They're the ones who made the mistake. They're assuming that the Williamson Sapsucker is a, what's called a burn increaser. That's the kind of species that does better in heavily burned habitat. Now, the Herringwood. I think the BBW and the HAW are burn increasers. They are burn increasers. For the BBW, though, there is no monitoring requirement. If you look at table E-9, I believe it's in SERQ, but it's the table that's cited in the brief from the framework document that has these requirements for population monitoring. Blackback Woodpecker isn't there, and their claim of irreparable. How about the Herringwood Pecker? Herringwood Pecker's there. Like the others, it's subject to monitoring consistent with a low vulnerability species. They criticize us for using the BBS data. Well, if you look at their exhibit, I believe it's their excerpt of record 27. It's the colored sheet from the BBS website. Herringwood Pecker data there is described on the site as, I believe the term is moderate quality or I had it here in my notes. Let's see. Data of moderate precision and abundance. They're criticizing us for using BBS data, but for the one species that's a burn increaser for which there is a requirement to do population monitoring under their interpretation of the framework, which the district court accepted. That species for which, in fact, according to their own exhibit, the BBS data provides is of moderate precision and abundance. So you don't even really need to get to the irreparable harm issue with respect to the Herringwood Pecker because they never showed that there was inadequate data even under their theory. Okay. Let me ask you one last question, and that's to get back to the California spotted owl, the so-called CASPO. Okay. In oral argument, Ms. Fazio primarily focused on her argument that on her version or the client's version as to how many trees will be cut, there's simply too much logging within the PACs and within the HRCAs. I've got a different question. You can respond to that, too, but I've got a different question. In her brief, she points out the fact that the PACs and the HRCAs were substantially redrawn, particularly in the power fire. That's to say there were ten areas originally. One of them is preserved more or less intact. Another one seems to be entirely gone. But as to eight of those, the boundaries are substantially redrawn in response to the fire. And in her brief, she says that the FEIS makes no attempt to analyze the consequences of that redrawing. What's your response to that? No, that's not. First of all, the correct data or information on redrawing is in the Laughlin Declaration, which we submitted to the district court when they, again, submitted a post-record declaration making these allegations about how the PACs were redrawn. But they dealt with this issue of the possibility. The reason PACs were redrawn, I have to go back and explain. The reason PACs were redrawn is for the California spotted owl, it's not a burn-increaser either. It's a species. This is discussed in the FEIS. They have studies that they say are inconsistent with the Forest Service's interpretation. But we dealt with them. The Forest Service dealt with them. Their view of the California spotted owl, supported by scientific evidence, is they are not the kind of species that would be a burn-increaser. They prefer the live trees. Some of the PACs were heavily burned, so that's why the boundaries were redrawn. Even so, they did monitoring to see if the California spotted owls might still return to some of those areas, even though they've been burned. In the EIS, they assumed they were doing the monitoring as the project was ongoing, but they assumed in the EIS that the birds would return. That's cited in our brief. We give a citation to the specific page in the EIS where that assumption is made. In other words, I understand all of that. All right. I'm asking you a slightly different question, which is raised by the Earth Island brief, which is to say you've preserved those, with the exception of the one which I'm not regarding as important for the moment, but you've redrawn the boundaries. Right. And the argument is that you had to analyze the consequence of the redrawing of the boundaries. And I don't see the analysis of the redrawing, so I think what you're going to have to tell me is we didn't need to do the analysis. And why not? Well, we wouldn't need to do an analysis of redrawn areas unless there were some reason to think that, contrary to the evidence the Forest Service cited in the EIS, they would, in fact, return there. We did take that possibility into account. But if they're redrawn because they were redrawn because the habitat's no longer suitable, what they're really disputing, I submit, Your Honor, is our conclusion that burned habitat is unsuitable for spotted owls. That's why they don't need it. But they justified that conclusion in the EIS, in the technical discussion. So that's why they wouldn't. Okay. I understand the response. All right. Let me ask you another question, which, I mean, I'm sorry to be so sort of scanner shot here, but there's no way around it. On page 43 of your brief, in a footnote, you object to the expert declarations. Right. As with other expert declarations, you hear this is the bond declaration, I think, relied upon by plaintiffs in this appeal. The bond declaration was not before the agency during the administrative process and accordingly is not properly before the court on judicial review. How do you get the Smith Declaration in on that theory? Well, if they're entitled to put their declarations in, we're entitled to respond to them. They can't say we can't respond if they can't. But the Smith Declaration, I think, would be required even without the Royce Declaration. That is to say, I read the FEIS the way Dr. Royce read it without his assistance. And the only way I can understand it in the way that Smith says I should understand it is to read her declaration that's been submitted after the administrative process. Well, we submitted it in response to what they submitted. I would say, first of all, they didn't object, to my knowledge, to the Smith Declaration coming in. So — But what I have is a sauce for the goose, sauce for the gander problem. I think that — I'm not sure how Your Honor would get to the need. I'd have to — I think I would disagree with the claim that we would have had to submit the Smith Declaration. That's a hypothetical, obviously. I'm not sure you would have had to or not. But I would tell you, without the Smith Declaration, I read this EIS and I say, this is crazy. I don't understand it. I think you would only read it as crazy, as Your Honor put it, if you had someone, at least for me, and maybe Your Honor is more — better at statistics than I am. But, you know, if I were looking at that document, I would read it to say, this is the probability that the marking guidelines will correctly predict the probability of mortality for trees in the forest. Well, I won't go through why I found it impossible to understand, but I had — before I read any of the declarations, as I was simply reading Table 3-6 and reading the FDIS, I said, these numbers can't work this way. And if I may ask, why is that? Well, the reason they couldn't work that way for me is — I'm now — pardon me while I sort among my papers here. I'm on — I'm in your experts — your supplemental experts of excerpts of record. If the survival — I'm now on Page — it's Table 3-6. Yeah. Page 77. Right. If the correctly predicted mortality is 95 percent and the correctly predicted survival is 63 percent, I say, wait a minute, why aren't those adding up to something close to 100 percent? I mean, those numbers don't make sense if they're just trying to predict survival and mortality. Then I would say, Your Honor, if you were a person — The only way they make sense is the way that Smith later explains them. Yeah, she does. I take it, Your Honor, does understand. I don't — I think I understand perfectly what her later declaration is. It's very clear. Yeah. Confidence numbers, not prediction of actual mortality. Right. I would come back to the point I made earlier. The remedy the APA gives you and the Supreme Court has insisted you follow is, if you don't follow the numbers, comment. There was an extensive public comment process. There were meetings held. This EIS — the notice of the EIS was put in the Federal Register. If somebody has a problem, there is a procedure that is — so that we don't — we're not here while the Forest Service is now — cuts 75 percent of the trees saying whether we should stop them from doing that. When this issue could have — this confusion, if there was confusion, could have been resolved. Agencies do make mistakes. They're human. But we have a process under the APA for addressing those mistakes. And if they don't follow that, I don't think it's fair to now punish the Forest Service. If I might be prepared to sum up, at the end of their brief, the plaintiffs say, in effect, well, we at least raised substantial questions on the merits here. And then they say — and then they get into the balance of hardships issue. I submit all they have done there is re-argue the evidence. Even if Your Honor believes that errors were made here, that they've raised substantial questions on the merits, the district court properly balanced the equities, considered the public interest, particularly the interest in being able to deal with severe public threats to health, to the water supply, the workers and private individuals who walk in these forests, who could be injured by these trees. They haven't even disputed the danger of having these trees fall on people in the forest. And that's one of the reasons we have this project. And even if Your Honor believes we made some mistakes, that's not enough to justify reversal. Thank you. Thank you. Now, I'm afraid we've taken the government well over time. Ms. Fazio, would you like to go a little over time? Let's shoot at four minutes and see where we go. All right. First of all, with regard to the guidelines and defendants' claims that we didn't bring to their attention the fact that there were some inaccuracies and that we weren't concerned about the fact that they would be removing trees that would otherwise survive their fire-related injuries, we did bring this to their attention. On page 514 and 515 of the Power FEIS, which unfortunately is not in the excerpts of record, however, in accordance with statements made in defendants' briefs, the entirety of the FEISs were submitted to the district courts. Read those page numbers again. I'm sorry. It's 514 and 515. Of the Power EIS? Of the Power FEIS. Okay. And we submitted comments that stated, on our site inspection of a portion of the Power Fire project area, we found that many of the stands that were in fact severely burned nevertheless had significant numbers of large live trees with 65 to 80 percent linear crown scorch. These are the only remaining source of local native genetic diversity adapted to these sites. If they are removed under Smith's guidelines, which would be approved, that diversity in the fire resistance and resilience it represents will be gone forever. Many, if not most, of these trees will likely survive long-term. Okay? We specifically said to these people, you have guidelines that are slated to cut down trees that would survive and could contribute to habitat and the regeneration of this area. And their response to us was, well, we've worked out some guidelines, and they're different depending on the species, and we were very clear that we're not challenging their guidelines with regard to red fir or with regard to incense cedar, because those are actually in compliance with the data that's available for these species. But the gist of their statement is on a piece of paper that I turned in to you, which is page 515. And it says, those trees meeting the marking guideline criteria have a high probability of mortality and are not likely to survive long-term. It's on page 515? Yes. Okay. And that's in their response to our comments. So I just want to read that one more time for effect. I heard it. Okay. We have a tape. The biggest issue here is maybe it was okay, and maybe Sherry Smith understood what she was doing, but the FEIS and the people who put that together and wrote it and presented it to the public did not. And even if you accept what Sherry Smith is saying, where in the analysis is the recitation of how many trees would likely survive their fire-related injuries? Where is that? Where is the analysis of what impact that will have on the California spotted owl, removing all these trees from their historic packs, from their home range core areas, that would survive and contribute to habitat? I mean, we're talking about trees larger than 40 inches in diameter. I mean, anywhere from 20 to 50 inches in diameter. They can take them all. There's no diameter limit, and there is definitely a possibility of irreparable harm that stems from these actions, and there is absence of analysis to address these concerns. And we were up front about this from the very beginning, and the way that this process was set up, we didn't get the final marking guidelines until the final EIS came out, and we didn't have the opportunity to appeal. So here we are having to have the court try and sift through this stuff because the agency didn't give us the opportunity to vet it out with them. But I know my four minutes, I have almost gone. It is gone. Can you sum up? The one other thing that I feel is very important is this reference to the table that defendants made as to why the court got it right with regard to the fact that there's going to be so much burned species habitat out there. I went through the numbers on Fred's and the fact that they were just completely wrong, but there's two conflicting tables in the EIS, and I wanted to take a minute just to illuminate for the court what the discrepancy is. The table on the top of this, which is in the Power FBIS 249, which is at ER 9, that's the table that plaintiffs' appellants rely on, and this table relates to the Power Fire area in its totality, which includes that burned on the National Park. Is this covered in your brief? It's really not. I mean, the allegation is there, but the specific response isn't because we didn't get the chance to reply. And they're making statements regarding Table 3-75. We're making statements regarding 3-77. And I just wanted to point out why 3-75 is not an accurate assessment. And this is in response to the argument that we heard at the end. Exactly. So we're relying on Table 3-77, and in order to assess whether there's, you know, what suitable habitat will be there before, what suitable habitat will be there after, you have to operate on the same spatial scale. So either you're talking about the project area, what's there before, what's there after, or you're talking about the fire area, what's there before, what's there after, so that you know how much is going to be left, because the judge in the district court case made a particular response that, oh, well, in the project area it's this, and if we include everything outside the project area, it's even so much greater, so there's no possibility of irreparable harm, though he didn't say possibility. So Table 3-77 offers up acreage numbers, you know, what was created by the fire, the power fire and the total power fire area, that would be suitable for these burn forest species. And then it offers up a number of how much would be left after all the logging. So we relied on those numbers, and we came up with basically a 79% reduction of suitable habitat for the blackback woodpecker. Now, the Forest Service relies on Table 3-75, which again says that it's talking about the whole power fire area, but the problem is that the high and moderate capable habitat available pre-treatment for the burn increasers is 4,957 acres. That only relates to the project area, whereas... That's to say Table 3-77 says under Alternative 4, and Table 3-75 does not have that qualifier. Right. That's the point? No, no. No, no, no, no. That's not the point. The point is that the first table deals with acres in the entire fire area. The amount that was created and the amount that will be removed. The table that they're referencing compares the amount of habitat in the project area, which is the 4,957 acres, and then says, oh, this is how much will be left afterwards, and includes not only the project area, but the fire area as well. So you get an accelerated number, which is 34%, which again isn't anywhere near the 52% that the judge claims, and it really, if you use the correct numbers, they're only maintaining 740 acres of this type of habitat within the project area. You come up with 15% retention. I think we have done the best we can. Okay. Thank you, Your Honor. We thank both sides for their argument in this somewhat complex case. The case of Earth Island Institute versus the United States Forest Service has now been submitted for decision. We are in adjournment until tomorrow morning.
judges: Noonan, Tashima, W. Fletcher